# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### JULY SESSION, 1998

FILED

October 28, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9710-CC-00455** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **BEDFORD COUNTY** |
| **VS.** | ) | |
| | ) | **HON. CHARLES LEE** |
| **KATHERINE IRENE WARREN,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | **(Direct Appeal - Sentencing)** |

FOR THE APPELLANT:

JULIE A. MARTIN
P. O. Box 426
Knoxville, TN  37901-0426

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

LISA A. NAYLOR
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN  37243-0493

MIKE MCCOWN
District Attorney General

MICHAEL D. RANDLES
Assistant District Attorney
218 North Main Street
Shelbyville, TN  37160

OPINION FILED _____

AFFIRMED

JERRY L. SMITH, JUDGE

# <u>OPINION</u>

On January 31, 1997, a Bedford County jury convicted Appellant, Katherine Irene Warren, of second degree murder in the killing of her husband. Following a sentencing hearing, the trial court sentenced Appellant to 20 years incarceration as a Range I standard offender. Appellant appeals from her conviction and sentence, raising two issues:

1) whether the evidence presented at trial was sufficient to support the jury's verdict, and
2) whether the trial court correctly sentenced Appellant.

After a review of the record, we affirm the judgment of the trial court.

## FACTS

The evidence presented at trial revealed that on March 19, 1996, officers responded to a "shots-fired" call on Cypress Street. Three officers approached the house, encountering Appellant as she came out the back door. The officers apprehended Appellant who told them that she had shot her husband with a rifle. The officers found the victim, Charles Warren, lying in the floor of the den unconscious, but alive. Officers located a bullet hole in a recliner near the victim, and eventually recovered a .22 slug from the back of the chair. A .22 caliber rifle was recovered from the washroom, which had a spent casing and 10 live rounds in it. Testimony revealed that the victim died as he was being carried to the ambulance.

In a statement made shortly after her arrest, Appellant related the events of the evening as follows:

> Charles was sitting in his recliner when I came home from AA. He had been drinking. He got a phone call then he proceeded to tell me about Valerie Elaine Jordan that he had been going with her 2 ½ years. I asked him for the money to move out on. He refused. We argued about 1 ½ hours then I went to bed after I took 200 milligrams of doxepin and 2 milligrams of Klonopin. I heard him talking on the phone, and I got back up. I heard him call her name and I snapped. I asked him where the gun was. He pointed to the laundry room, and said it wasn't loaded. I pulled back the gun to hit him with it, and it went off. I then dialed 911.

Evidence was presented that the rifle recovered at the scene was the weapon from which the slug recovered in the chair had come. Tests further indicated that the muzzle of the firearm was between 2 feet and 3 ½ feet from the victim when it was fired. Blood tests of the defendant revealed the presence of doxepin and nordoxepin in her blood. Additional tests revealed that the victim had a blood alcohol level of .15.

Appellant's daughter, Tammy Womack, testified that her mother and the victim had separated in May of 1994 because the victim had a girl-friend, but that the pair resumed living together in August, 1995. After Appellant again moved back in with her husband, she related to her daughter that she knew that the victim still had a girlfriend. She further testified that during a visit to her mother in jail, her mother stated that "[s]he was sorry, she knew what she did was wrong, and she was ready to take her punishment." Ms. Womack also stated that her mother had told her that the victim was having an affair with a woman named Tamiko Coope, and that he had purchased a car for her. Appellant told Ms.

Womack that she had attempted to kill herself several times because she was distressed about her husband's infidelity.

Edna Mabee, Appellant's sister, testified that on March 18, 1996, Appellant, while discussing her marital problems, stated, "if I kill my husband, so be it."

The medical examiner testified that Charles Warren died as a result of bleeding from a bullet passing through his heart and right lung.

Appellant testified at trial, stating that she was married to the victim for almost ten years. She said that on May 10, 1994 she began to suspect that her husband was having an extra-marital affair upon discovering pornographic movies and a dildo in his possession. She moved out of their house, having demanded and received $5,000 from the victim. After she moved out, the victim confessed that he had been having an affair with a nineteen year-old woman, Tamika Coope. The victim told Appellant that he had paid for Ms. Coope to have two abortions, but that he had wished for Ms. Coope to have the children and for Appellant to help him raise them. The victim also related that he had purchased a car for Ms. Coope. Appellant later learned of an affair with a woman named Sue Wood. Appellant confronted Ms. Wood, who did not know that Charles Warren was married. After Appellant confronted Ms. Wood, the victim admitted to having an affair with Ms. Wood.

Appellant testified that she moved back in with her husband in October 1995, that they were trying to work through their marital difficulties. She stated

that her husband asked her for one year in which to get his life together. Appellant said that the night of the shooting, she returned home from an AA meeting to find her husband drinking. This upset her and the two began to have words. At some point in the argument, the victim showed Appellant pictures of himself at a New Year's Eve party with Ms. Valerie Jordan. The victim told Appellant that he and Ms. Jordan had been having an affair for 2 ½ years. The victim also disclosed that he had not had sex with Appellant in several months, because he had AIDS and was protecting her. Appellant went to bed after taking her medication.

Two hours later, Appellant awoke to overhear her husband say the name "Valerie" while on the phone. She also overheard him making plans for Ms. Jordan to bring her child and come to his house on Sunday to meet his parents. Appellant stepped into the room and said, "No you are not," or something to that effect. Appellant then asked her husband where the gun was. He pointed toward the laundry room. Appellant testified at trial that the victim told her the gun was unloaded and that she intended only to use the weapon to get the victim's attention. Appellant got the gun and pointed it at her husband. Mr. Warren got off the phone and began to stand up from where he was sitting in the recliner. Appellant testified that she attempted to poke the victim with the gun and the gun went off. The victim turned, took a couple of steps, and fell. Appellant called 911.

Further testimony was presented at trial to indicate that Appellant suffers from clinical depression and auditory hallucinations. Both Ms. Coope and Ms. Jordan testified, verifying the sexual nature of their relationships with the deceased.

-5-

## I. SUFFICIENCY OF THE EVIDENCE

Appellant challenges the sufficiency of the evidence presented at trial to support the jury verdict of murder in the second degree. Specifically Appellant alleges that the State failed to present evidence sufficient to establish that Appellant knowingly committed this crime. When an appellant challenges the sufficiency of the evidence, this Court is obliged to review that challenge according to certain well-settled principles. A verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Although an accused is originally cloaked with a presumption of innocence, a jury verdict removes this presumption and replaces it with one of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with Appellant to demonstrate the insufficiency of the convicting evidence. Id. On appeal, "the [S]tate is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Id. (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Harris, 839 S.W.2d 54, 75; Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In conducting our evaluation of the convicting evidence, this Court is precluded from reweighing or reconsidering the evidence. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim.

App. 1996); <u>State v. Mathews</u>, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, this Court may not substitute its own inferences "for those drawn by the trier of fact from circumstantial evidence."<u>Id.</u> at 779. Finally, the Tennessee Rules of Appellate Procedure, Rule 13(e) provides, "findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact beyond a reasonable doubt." *See also* <u>State v. Mathews</u>, 805 S.W.2d at 780.

In the matter <u>sub judice</u>, Appellant contests the evidence presented to prove the knowing element of second degree murder. Tennessee Code Annotated 39-11-106 defines "knowing" as:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Proof of a <u>mens rea</u> element is almost always circumstantial. The only means the jury has to determine a perpetrator's state of mind is to examine the offender's actions for clues of what was in the mind as the acts were performed. The State presented proof that Appellant had, on several occasions, made statements about wishing her husband dead. The State further presented proof that after an argument, upon hearing her husband invite his lover to the marital home, Appellant took a gun and shot her husband at point blank range. Without more, such proof certainly indicates that Appellant knew the consequences of her actions. The State also presented proof that two weeks after the shooting

Appellant told her daughter that "[s]he was sorry, she knew what she did was wrong, and she was ready to take her punishment." Appellant argues that since proof was presented to the jury that the victim told Appellant the gun was empty that her actions were not knowing and the shooting was accidental. The weight and credibility of the witnesses' testimony are matters entrusted to the jury as the exclusive triers of fact. State v. Sheffield, 676 S.W.2d 542 (Tenn. 1984); Byrge v. State, 575 S.W.2d 292 (Tenn. Crim. App. 1978). By its verdict, the jury refused to credit Appellant's self-serving testimony that she thought the gun was not loaded. This issue is without merit.

## II. SENTENCING

Appellant also claims that the trial court erred in sentencing her to 20 years incarceration, failing to consider several applicable mitigation factors. When a defendant complains of his or her sentence, we must conduct a de novo review with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). The burden of showing that the sentence is improper is upon the appealing party. Tenn. Code Ann. § 40-35-401(d) Sentencing Commission Comments. This presumption, however, is conditioned upon an affirmative showing in the record that the trial court considered the sentencing principles and all the relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The Sentencing Reform Act of 1989 established specific procedures which must be followed in sentencing. These procedures, codified at Tennessee Code Annotated § 40-35-210, mandated the court's consideration of the following:

(1) The evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) [a]ny statement the defendant wishes to make in his own behalf about sentencing.

Tenn. Code Ann. § 40-35-210.

This section further provides that the midpoint within the range is the presumptive sentence for a Class A felony. The court must begin with the midpoint in the range and enhance that sentence to appropriately reflect any statutory enhancement factors that the court finds to be present. After enhancing the sentence, the court must reduce the sentence appropriate to the weight of any mitigating factors that the court finds. *See* State v. Chance, 952 S.W.2d 848 (Tenn. Crim. App. 1997).[1] The weight to be given each factor is left to the

---

[1]

In State v. Chance, this Court, in reviewing Tennessee Code Annotated § 40-35-210© held:

> [A]pplying Appellant's plain language reading of the statute, a class A felon who commits an offense where the trial court finds only enhancement factors or both enhancement and mitigating factors applicable may very well receive a shorter sentence than a felon committing a class A offense involving no enhancement or mitigating factors. *See* Tenn. Code Ann. 40-35-201(c),(d), and (e). This would produce an absurd result. We presume that the legislature did not intend such an absurdity in enacting this statute. *See* McClellan v. Bd. Of Regents of State, 921 S.W.2d 684, 489 (Tenn. 1996); Epstein v. State, 211 Tenn. 633, 366 S.W.2d 914, 918(1963). Accordingly, "such a result will be avoided if the terms of the statute admit of it by a reasonable construction." Epstein, 366 S.W.2d at 918.
>
> With consideration of the public's growing concern over violent crimes, defendants committing class A felonies should not be entitled to a presumptive sentence at the minimum of the sentencing range. *See* Tenn. Code Ann. 40-35-210(c)(retaining the presumptive sentence for class B,C,D, and E, felonies at the minimum but increasing the presumptive sentence for class A felonies to the midpoint of the range.) Moreover, it is difficult to conceive that the legislature would have intended a longer sentence for a class A felony with an enhancement factor than for a class A felony with an enhancement factor. Thus, we conclude that the presumptive sentence for all class A felonies is the midpoint of the applicable range.

discretion of the trial judge. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

The Sentencing Reform Act also provides that the trial court shall place on the record either orally or in writing what enhancement or mitigating factors it found, if any. These findings are crucial for review of the trial court's decision upon appeal.

In the matter sub judice, the trial court faithfully followed the guidelines proscribed by the Sentencing Reform Act, therefore we must treat his determination with a presumption of correctness. Both sides concur that the enhancement factor regarding use of a firearm in the perpetration of the offense clearly applies in this case. Appellant claims that the trial court erred in refusing to apply the following mitigating factors: Tennessee Code Annotated §§ 40-35-113(8) that Appellant suffered from a mental condition that significantly reduced her culpability for the offense, (11) that Appellant, although guilty, committed the offense under such unusual circumstances that it is unlikely a sustained intent to violate the law motivated her conduct, and (13) Appellant's lack of prior criminal history and her history of mental instability. After a review of the record, we find no proof to overcome the presumption of the trial court's correctness.

While there was testimony that Appellant suffered some mental and emotional problems, there was no proof introduced showing that these problems somehow compelled Appellant's actions, or reduced her ability to appreciate what she was doing in shooting her husband. Thus mitigating factor (8) was properly rejected by the trial judge. Further, Appellant had discussed killing her husband

in the past and had expressed her desire that he die. Under the circumstances the trial court properly rejected the idea contained in mitigating factor (11) that Appellant's actions were not the product of a sustained intent to violate the law.

Finally, although the absence of a prior criminal record is not an enumerated mitigating factor, it may be considered as one. State v. Hicks, 868 S.W.2d 729 (Tenn. Crim. App. 1993). However, the weight to be assigned to this factor remains in the discretion of the trial judge. Id. In the present case the trial court concluded that Appellant's "rather unstable social history" precluded application of the lack of a criminal record in mitigation of Appellant's sentence. Although we are unaware of any case or statute that precludes use of this factor in the face of an unstable social history, given the Appellant's record of alcoholism, nine marriages, and psychiatric treatments, as well as the seriousness of the crime, the trial judge could properly assign little weight to the lack of a criminal record.

Accordingly, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE

CONCUR:

-11-

_____

PAUL G. SUMMERS, JUDGE


_____

DAVID G. HAYES, JUDGE